1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Grand Canyon Trust,                    )    No. CV-07-8164 PCT-DGC
                                           )
10              Plaintiff,                 )    **ORDER**
                                           )
11  vs.                                    )
                                           )
12  U.S. Bureau of Reclamation, et al.,    )
                                           )
13              Defendants.                )
    _____    )

14

15          Plaintiff Grand Canyon Trust has filed suit against the United States Bureau of

16  Reclamation and the Commissioner of the Bureau (collectively, the "Bureau").  Dkt. #1.

17  Plaintiff has named the United States Fish and Wildlife Service ("FWS") as a defendant in

18  a supplemental complaint. Plaintiff describes itself as an organization created to "protect and

19  restore the canyon country of the Colorado Plateau" including its "diversity of plants and

20  animals."  Dkt. #59 ¶ 8.  Plaintiff claims that the Bureau's current operation of the Glen

21  Canyon Dam, particularly the Dam's non-seasonal fluctuating releases of water into the

22  Colorado River, jeopardizes the endangered humpback chub and its habitat and fails to

23  comport with statutory procedures.  The Court allowed several States and other entities to

24  intervene in this case as defendants, including Arizona, California, Colorado, Nevada, New

25  Mexico, Utah, Wyoming, the Colorado River Commission of Nevada, the Southern Nevada

26  Water Authority, the Colorado River Energy Distributors Association, the Central Arizona

27  Water Conservation District, the Imperial Irrigation District, and the Metropolitan Water

28  District of Southern California (collectively, "Intervenors").  Dkt. #98.

1

## I.   Background.

Glen Canyon Dam is located on the Colorado River in Northern Arizona.  The Dam creates Lake Powell, 186 miles long and the second largest reservoir in the United States. Congress authorized the construction of the Dam in 1956 for the purposes of "regulating the flow of the Colorado River, storing water for beneficial consumptive use, [and] making it possible for the States of the Upper Basin to utilize . . . the apportionments made to and among them."  42 U.S.C. § 630.  Generation of hydroelectric power was recognized as "an incident of the foregoing purposes[.]"  *Id.*

The humpback chub is a "big-river fish" that developed in the canyons of Northern Arizona three to five million years ago.  The species exists primarily in the relatively inaccessible canyons of the Colorado River.  Six humpback chub populations have been identified, five upstream of the Dam and one downstream.

The humpback chub was listed as endangered under the statutory predecessor to the Endangered Species Act ("ESA").  32 Fed. Reg. 4001 (Mar. 11, 1967).  In 1973, the chub was listed as endangered under the newly-enacted ESA.  38 Fed. Reg. 106 (June 4, 1973). In 1994, critical habitat for the chub was designated.  Such habitat is essential for the endangered species' survival and therefore requires special management.  59 Fed. Reg. 13374 (Mar. 21, 1994).

### A.   Plaintiff's Factual Assertions.

The Bureau operates the Dam using a water release system known as the "modified low fluctuating flow" or "MLFF."  Plaintiff contends that the MLFF system  impermissibly harms the humpback chub and its habitat, while a "seasonally adjusted steady flow" or "SASF" system would be more accommodating of the chub and more consistent with the Bureau's obligations under the ESA.  Plaintiff also claims that the Bureau has failed to fulfill its obligation to consult with FWS in developing the Dam's annual operating plans and to assess the environmental impacts of those plans.

The MLFF consists of fluctuating water releases tied to the demand for electricity generated by the Dam.  Plaintiff alleges that the Dam's water releases vary by a factor of five

over a 24-hour cycle, resulting in a daily vertical variation of the Colorado River by as much as six feet.  Plaintiff alleges that this release schedule adversely impacts the humpback chub and its habitat.  In particular, "[s]ediment and the movement of sand within the Colorado River system ensure the formation of shoreline habitats the chub needs for spawning, rearing, and feeding," but the Dam's operation "blocks the transportation of upstream sediments," disrupts traditional "river flows, shoreline habitats, and temperatures," "reduc[es] and limit[s] chub distribution, reproduction and population," and "alter[s] biological and habitat features[.]"  Dkt. #17 at 6-7, 20.  Plaintiff contends that the Dam's fluctuating releases are inconsistent with thirty years of Bureau statements acknowledging the harm such fluctuations cause to the humpback chub and its habitat.

A 1994 FWS biological opinion determined that the MLFF's fluctuating flows "jeopardize" the humpback chub and "adversely modify" its habitat.[1]  Plaintiff asserts that the Dam operation does not follow the 1994 opinion's recommendation of seasonally adjusted steady flows during all low water years.[2]  According to Plaintiff, the recommendation is intended to mimic natural conditions in the Colorado River and would not jeopardize the endangered humpback chub nor adversely modify critical habitat.  Plaintiff alleges that the recommendation and its seasonally adjusted steady flow regime was to be implemented by 1998, but never was.

**B.    The 2008 Plan.**

The Bureau has adopted a 2008 Experimental Plan that mandates continuation of the MLFF system, but with a high water release in March of 2008 and steady flows in September and October of 2008-2012.  The Bureau completed an environmental assessment ("EA") for this plan and found that the environmental impact would be insignificant ("FONSI").

---

[1]The 1994 opinion was signed on December 21, 1994, but was not transmitted to the Bureau until January 7, 1995.  Plaintiff refers to the opinion as the 1994 opinion, while the Bureau refers to it as the 1995 opinion.  The Court will refer to it as the 1994 opinion.

[2]A "low water year" is one in which only 8.23 million acre-feet, the minimum water required to satisfy the water supply, is released from the Dam.  *See* Dkt. #17 at 12 n.9.

1   FWS issued a new biological opinion on February 27, 2008.  The opinion states that

2   it replaces the 1994 biological opinion and notes that "some combination of conditions under

3   MLFF has benefitted the humpback chub, and that more recent conservation actions likely

4   have as well[.]"  Dkt. #27, Ex. 4 at 52.  The opinion concludes that "implementation of the

5   March 2008 high flow test and the five-year implementation of MLFF with steady releases

6   in September and October," as proposed in the 2008 Experimental Plan, "is not likely to

7   jeopardize the continued existence of the humpback chub . . . and is not likely to destroy or

8   adversely modify designated critical habitat for the humpback chub."  *Id*. at 51.

9       **C.    This Suit and the Parties' Motions.**

10  Plaintiff filed suit on December 7, 2007, claiming that the Bureau had violated the

11  ESA and the National Environmental Policy Act ("NEPA").  Dkt. #1.  Specifically, Plaintiff

12  asserts that the Bureau has (1) violated the ESA by jeopardizing the humpback chub,

13  (2) violated the ESA by destroying or adversely modifying the chub's critical habitat,

14  (3) violated the ESA by "taking" the chub, (4) violated the ESA by failing to consult with

15  FWS on the development of annual operating plans for the Dam, and (5) violated NEPA by

16  failing to prepare environmental assessments or impact statements regarding the Dam's

17  annual operating plan.  *Id.*  On February 15, 2008, Plaintiff moved for summary judgment

18  on these five claims.

19  On March 14, 2008, Plaintiff filed a supplemental complaint asserting three additional

20  claims: (6) that the Bureau failed to provide an opportunity for public comment with respect

21  to the 2008 EA or FONSI, (7) that the FONSI and the 2008 biological opinion issued by

22  FWS are based on an inadequate assessment of the harms of the MLFF system, and (8) that

23  the 2008 plan does not sufficiently consider or adopt the seasonally-adjusted steady flow

24  scheme.  Dkt. #23.  These claims are not at issue in the current motions, but they will be

25  mentioned in this order.

26  On March 17, 2008, the Bureau filed a motion to dismiss, or in the alternative, cross-

27  motion for summary judgment, and moved to stay briefing on claims 1-3.  Dkt. ##24-25.  The

28  Bureau's motion asks the Court to dismiss or grant summary judgment on the five original

1
2
3
4

causes of action.  *Id.*  The Court denied the motion to stay and required the Bureau to brief claims 1-3.  Dkt. #58.  The Intervenors joined the Bureau's cross-motion and memoranda. Dkt. ##76, 80.  The Court held oral argument on August 29, 2008.  Dkt. #116.  Supplemental briefs were filed at the Court's request.  Dkt. ##117-22.

5

**II.    Are Claims 1, 2, and 3 Moot?**

6
7
8
9
10
11
12
13
14
15
16
17
18

The ESA requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]"  ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2).  Claims 1 and 2 allege that the Bureau has violated this provision by jeopardizing the humpback chub and adversely modifying its habitat.  The ESA also makes it unlawful for any person to "take" any endangered species "within the United States or the territorial sea of the United States[.]" ESA § 9(a)(1)(B), 16 U.S.C. § 1538(a)(1)(B).  "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  ESA § 3(19), 16 U.S.C. § 1532(19).  Claim 3 alleges that the Bureau's actions have resulted in an unauthorized "take" of the humpback chub.  The parties do not dispute that the humpback chub and its habitat fall within these protections, nor that the Bureau is subject to the ESA.

19
20
21
22
23
24
25
26

The Bureau argues that claims 1, 2, and 3 are premised exclusively on the continuing validity of the 1994 biological opinion, that this opinion was replaced by the 2008 biological opinion, and that the claims therefore are moot.  Plaintiff's original complaint did seem to predicate claims 1 through 3 on the Bureau's violation of the 1994 opinion.  Claim 1, for example, alleged that "by failing to comply with the 1994 Biological Opinion and operating Glen Canyon Dam under a [MLFF] regime, [the Bureau] is violating its mandatory ESA section 7 duty to avoid jeopardy."  Dkt. #1 ¶ 52.  Claims 2 and 3 contained similar language. *Id.* ¶¶ 56, 60.

27
28

Plaintiff filed a supplemental complaint on April 10, 2008.  Dkt. #59.  The Bureau stipulated to this filing.  Dkt. #47.  The supplemental complaint modified claims 1, 2, and 3

to make them less dependent on the 1994 opinion.  Although each claim continues to refer to the opinion, the alleged wrongdoing is violation of the ESA.  Claim 1 asserts, for example, that "[o]perating Glen Canyon Dam under a [MLFF] regime violates [the] ESA section 7(a)(2) prohibition against jeopardizing a listed species," that the Bureau "has and is operating Glen Canyon Dam under a [MLFF] regime," and that the Bureau therefore "is violating its mandatory ESA section 7 duty to avoid jeopardy."  Dkt. #59, ¶¶ 58-60.  Claim 2 contains virtually the same language, but asserts that the Bureau's operation violates the ESA "duty to avoid actions that destroy or adversely modify critical habitat."  *Id*. ¶ 64.  Claim 3 asserts that the Bureau "has unlawfully withheld compliance with section 9(a)(1)(B)'s 'take' prohibition[.]"  *Id*. ¶ 68.  Although this claim asserts that the Bureau failed to comply with the 1994 opinion's recommendation, the wrong alleged is violation of the ESA, not violation of the 1994 opinion.  *Id*. ¶¶ 67-68.

The Court finds that the supplemental complaint clearly alleges violations of the ESA.  This conclusion is bolstered by the fact that claims 1, 2, and 3 are asserted only against the Bureau, the entity charged with operating the Dam.  They are not asserted against FWS, the entity that wrote the 1994 opinion.

The Bureau bases its mootness argument on *American Rivers v. National Marine Fisheries Service*, 126 F.3d 1118 (9th Cir. 1997).  The plaintiffs in that case alleged that a 1994-1998 biological opinion concerning the operation of dams on the Columbia River violated section 7(a)(2) of the ESA.  *Id*. at 1122.  The claim became moot when the National Marine Fisheries Service issued a 1995 biological opinion that superceded the 1994-1998 opinion.  *Id*. at 1123-24.  The Bureau argues that Plaintiff's claims 1, 2, and 3 are similarly rendered moot by the 2008 opinion's replacement of the 1994 opinion.

The action at issue in *American Rivers*, however, was a challenge to the validity of the 1994-1998 biological opinion.  The Ninth Circuit specifically noted that the case constituted "an attack on the 1994-1998 Biological Opinion" and a "challenge to the 1994-1998 Biological Opinion."  *Id.* at 1124.  Although the plaintiffs also were attacking the manner in which the defendants were transporting salmon to comply with the ESA, the

challenge was based on the invalidity of the 1994-1998 opinion on which the defendants were relying. *Id*. at 1123-24. When the challenged biological opinion was superceded by a new opinion, the challenge to the old opinion became moot. *See also Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1071, 1074-75 (9th Cir. 1995) (challenge to validity of 1993 biological opinion rendered moot by issuance of superceding opinion).

This case is different. Claims 1, 2, and 3 assert that the Bureau's operation of Glen Canyon Dam under an MLFF regime violates the ESA. Plaintiff does not assert that Defendants are wrongfully relying on an invalid 1994 opinion, but that the 1994 opinion and other documents support its claim that operation of the Dam violates the ESA. Such a challenge is not rendered moot by issuance of the 2008 opinion, even if it does replace the 1994 opinion. The Bureau continues to operate the Dam under the MLFF regime and the legality of that operation under the ESA remains a live issue. The Court will therefore deny the Bureau's motion to dismiss claims 1, 2, and 3 as moot.

**III.     Sufficiency of Plaintiff's Notice on Claims 1, 2, and 3.**

The Bureau argues that the Court lacks subject matter jurisdiction over claims 1, 2, and 3 because Plaintiff failed to provide sufficient notice 60 days before filing suit. Specifically, the Bureau asserts that Plaintiff's notice of claim was based on violations of the 1994 opinion and did not include the claims now asserted in the supplemental complaint and described in response to the motion to dismiss.

No lawsuit may be commenced under the citizen suit provision of the ESA "prior to 60 days after written notice of the violation has been given . . . to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A)(I). This notice requirement is jurisdictional. *Sw. Ctr. for Biological Diversity v. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998); *Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988). Failure to comply with the notice requirement acts as an absolute bar to bringing suit under the ESA. *Sw. Ctr.*, 143 F.2d at 520.

"'The purpose of the 60-day notice provision is to put the agencies on notice of a perceived violation of the statute and an intent to sue. When given notice, the agencies have

an opportunity to review their actions and take corrective measures if warranted.  The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation.'"  *Id.* (quoting *Forest Conservation v. Espy*, 835 F. Supp. 1202, 1210 (D. Idaho 1993), *aff'd*, 42 F.3d 1399 (9th Cir. 1984)).  "At a minimum, [Plaintiff] was obligated to provide sufficient information of a violation so that the [Bureau] could identify and attempt to abate the violation."  *Id.* at 522.

Plaintiff's letter of September 12, 2007, satisfies the notice requirement.  The letter does assert that the Dam is being operated contrary to the 1994 opinion, but it is a violation of the ESA that is the gravamen of Plaintiff's complaint.  The letter specifically states that "by operating Glen Canyon Dam in low water years under MLFF, the Bureau is jeopardizing the humpback chub . . . and adversely modifying critical habitat in violation of the ESA."  Dkt. #101-2 at 2.  The letter further asserts that "[b]y operating Glen Canyon Dam during low water years under the MLFF program, the Bureau has unlawfully taken the endangered chub . . . in violation of ESA section 9(a)(1)."  *Id.* at 4.

The Court concludes that the letter provided sufficient information for the Bureau to identify and attempt to abate the alleged ESA violation caused by the MLFF regime.  The Court will not dismiss claims 1, 2, and 3 for lack of notice.

**IV.   The Standard of Review and Merits of Claims 1, 2, and 3.**

**A.   APA Review.**

The Bureau contends that the Court's review of claims 1, 2, and 3 is limited to the "arbitrary and capricious" standard established by the APA and must be confined to the administrative record already lodged with the Court.  Plaintiff concedes that the standard of review is "arbitrary and capricious," but contends that the scope of review is not limited to the administrative record.  The parties also appear to disagree on the scope of the administrative record, although they have not addressed this question directly.

**1.   Standard of Review.**

The ESA does not contain a standard of review.  The Court therefore must evaluate the defendants' administrative decisions using the APA standard.  *See Or. Natural Res.*

*Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007) ("As the ESA does not itself specify a standard of review of its implementation, we apply the general standard of review of agency action established by the [APA]."); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 934 n.4 (9th Cir. 2006) ("When reviewing administrative decisions involving the ESA, we are guided by section 706 of the Administrative Procedure Act."). The Court may set aside an agency's decision under the APA only if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001). "This standard of review is highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem Alliance v. U.S. Fish and Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotes and citation omitted).

### 2.    Scope of Review.

Review under the APA usually is restricted to the administrative record. *See, e.g., Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1243 (9th Cir. 2001) ("[t]he reviewing court may not substitute reasons for agency action that are not in the record"); 5 U.S.C. 706(2) ("the court shall review the whole record or those parts of it cited by a party"). The Court may consider materials outside of the administrative record "(1) if necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) when the agency has relied on documents not in the record, . . . (3) when supplementing the record is necessary to explain technical terms or complex subject matter, [or] . . . (4) when plaintiffs make a showing of agency bad faith." *Ctr. for Biological Diversity*, 450 F.3d at 943.

Plaintiff cites *Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024, 1034 (9th Cir. 2005), for the proposition that any claim brought under the ESA citizen suit provision is not subject to this APA record review limitation. But such a rule would be contrary to the majority of Ninth Circuit cases which hold that ESA claims are subject to APA review. *See*, *e.g.*, *Or. Natural Res. Council*, 476 F.3d at 1035-36; *Ctr. for*

1  *Biological Diversity*, 450 F.3d at 943; *Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't

2  *of the Navy*, 383 F.3d 1082, 1086 (9th Cir. 2004); *Selkirk Conservation Alliance v. Forsgren*,

3  336 F.3d 944, 953-54 (9th Cir. 2003); *Ariz. Cattle*, 273 F.3d at 1236; *Pyramid Lake Paiute*

4  *Tribe of Indians v.  U.S. Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990); *see also S.*

5  *Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, No. CIV S-06-2845 LKK JFM,

6  2008 WL 3932358, at *2 (E.D. Cal. Aug. 26, 2008); *Home Builders Ass'n of N. Cal. v. U.S.*

7  *Fish & Wildlife Serv.*, No. CIV. S-05-0629 WBS-GGH, 2006 WL 3190518 (E.D. Cal.

8  Nov. 2, 2006).

9       Although it is true that *Washington Toxics* suggests that ESA claims are not limited

10  to the agency record, the case devoted all of one paragraph to the subject of APA review and

11  failed to cite any of the numerous Ninth Circuit cases holding that APA review applies in

12  ESA cases.  413 F.3d at 1034.  This Court is not charged with deciding whether a decision

13  of the Ninth Circuit is incorrect, but it appears that *Washington Toxics* does not represent the

14  majority view in this circuit and that it and the few cases that have followed it are best

15  understood as agency inaction cases.  *See, e.g.*, *W. Watersheds Project v. Kraayenbrink*, Nos.

16  CV-05-297-E-BKW, CV-060275-E-BLW, 2007 WL 1667618, at *19-20 (D. Idaho June 8,

17  2007) (stating that court is not bound by the APA record review limitation in an ESA citizen

18  suit challenging an agency's failure to consult, although the court ultimately relied solely

19  upon material within administrative record); *Defenders of Wildlife v. Martin*, 454 F. Supp.

20  2d 1085, 1094 (E.D. Wash. 2006) (relying on extra-record material to grant an injunction

21  until agency remedied its failure to consult); *Seattle Audubon Soc'y v. Norton*, No. C05-

22  1835L, 2006 WL 1518895, at *1-3 (W.D. Wash. May 25, 2006) (finding that a court has

23  discretion in choosing whether or not to apply the APA standards and ultimately choosing

24  to apply APA record review limitation).

25       Claims 1, 2, and 3 involve the Bureau's actions in operating Glen Canyon Dam, not

26  agency inaction.  The Court therefore will apply the Ninth Circuit's traditional view and limit

27  its consideration of claims 1, 2, and 3 to the administrative record.  As the Ninth Circuit

28  reiterated in 2006, "[w]hen reviewing an agency decision, 'the focal point for judicial review

should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Ctr. for Biological Diversity*, 450 F.3d at 943 (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

### B. Merits of Claims 1, 2, and 3.

Plaintiff asks the Court to hold that the Bureau has violated the ESA by jeopardizing, destroying habitat for, and taking the humpback chub. Plaintiff supports this argument primarily with the 1994 opinion, noting that the opinion found that operation of the Dam under an MLFF regime would jeopardize the chub and destroy or adversely modify its habitat. Plaintiff cites numerous other documents in support of its contention that MLFF operations violate the ESA, including a 1978 biological opinion, 1990 recovery plan, the Grand Canyon Protection Act of 1992, a 1999 insufficiency letter, a 2002 insufficiency letter, a 2005 SCORE report, a 2007 biological opinion, and a 2008 USGS study, among others. Plaintiff further claims that the 2008 biological opinion is procedurally and substantively flawed and cannot be relied upon for a finding of compliance with the ESA.

The Bureau disputes these factual assertions and claims that Plaintiff is relying on outdated scientific information contained in the 1994 opinion. The Bureau cites the 2008 biological opinion and its finding that jeopardy, habitat destruction, and taking are not likely under current Dam operations. The Bureau notes that it conducted a series of flow tests in 1996, 1997, and 2000 and has eliminated non-native fish that prey on the humpback chub. The Bureau asserts that the population decline of the humpback chub has decreased and the population of adult fish has increased since 2001. The Bureau cites numerous documents in the administrative record showing, it claims, that FWS has never found the Bureau to be in violation of the 1994 opinion or the ESA.

The most pivotal document from the Bureau's perspective is the 2008 biological opinion. The most pivotal document from Plaintiff's perspective is the 1994 opinion that purportedly was superceded by the 2008 opinion. Thus, the validity of the 2008 opinion is central to the Court's resolution of the parties' dispute on claims 1, 2, and 3. Because Plaintiff's claim 7 asserts that the 2008 opinion is invalid and should be disregarded, the

1    Court concludes that it should address claim 7 before deciding claims 1, 2, and 3.  The Court

2    will defer ruling on these claims until after the parties have briefed claims 6, 7, and 8.[3]

3    **V.    Claim 4.**

4          Plaintiff claims that the Bureau has violated the ESA by failing to consult with FWS

5    each time the Bureau has prepared an annual operating plan ("AOP") for the Dam.  For the

6    reasons stated below, the Court will enter summary judgment in the Bureau's favor on this

7    claim.

8          **A.    ESA Consultation Requirements.**

9          The ESA establishes a three-step process.  First, an agency proposing to take an

10   "agency action" must inquire of the Secretary of the Interior whether any threatened or

11   endangered species may be present in the area of the proposed action.   16 U.S.C.

12   § 1536(c)(1).  Second, if the answer is yes, the acting agency must prepare a "biological

13   assessment" to determine whether such species "is likely to be affected" by the proposed

14   agency action.  *Id*.  Third, if the acting agency determines in the biological assessment that

15   its proposed action may affect a threatened or endangered species, the acting agency must

16   engage in formal consultations with the agency designated to protect the species, in this case

17   the FWS.  50 C.F.R. § 402.14(a).

18         Formal consultation is initiated by a written request.  The acting agency must provide

19   FWS with the best scientific and commercial data available.  50 C.F.R. § 402.14(c).  The

20   FWS then issues a "biological opinion" stating its view on whether the proposed agency

21   action will affect the endangered species or its habitat.  16 U.S.C. § 1536(b)(3)(A).  If the

22

23   ───────────────

24         [3]The Bureau contends that the Court cannot fashion a remedy to address the violations
     in claims 1, 2, and 3 because they concern wholly past events.  *See Gwaltney of Smithfield*
25   *v. Chesapeake Bay Found*., 484 U.S. 49, 57-60 (1987).  As concluded above, however,
     Plaintiff challenges the ongoing operation of the Dam, not merely past operations.  The
26   Bureau further contends that the only remedy available for ongoing violations would be to
     order the resumption of consultation between the Bureau and FWS, a process only recently
27   concluded.  As Plaintiff has not moved for summary judgment on the question of remedies
     and the parties generally have not addressed that issue, the Court will not rule on it now.
28

1  opinion concludes that the agency action is likely to jeopardize the protected species, FWS
2  may recommend "reasonable and prudent alternatives to the proposed action." *Id.*

3      If the biological assessment of the acting agency concludes that the agency action is
4  "not likely to adversely affect" an endangered or threatened species, the acting agency may
5  seek informal consultation with FWS.  50 C.F.R. § 402.13(a).  FWS may issue a written
6  concurrence in the determination or may suggest modifications that the acting agency could
7  take to avoid the likelihood of harm to the endangered species.  50 C.F.R. § 402.13(b).  If
8  FWS does not agree that the agency action is not likely to adversely affect the protected
9  species, formal consultation must occur.  50 C.F.R. § 402.14.  Thus, "[f]ormal consultation
10  is excused only where (1) an agency determines that its action is unlikely to adversely affect
11  the proposed species or habitat, *and* (2) [FWS] concurs with that determination."  *Natural*
12  *Res. Def. Council v. Houston*, 146 F.3d 1118, 1126 (9th Cir. 1999) ("*NRDC*") (emphasis in
13  original).

14      The Court's review of this claim is governed by the APA.  5 U.S.C. § 706.  The
15  Bureau's decision not to consult with respect to AOPs may be set aside only if it is "arbitrary,
16  capricious, an abuse of discretion, or otherwise not in accordance with law," or if it is found
17  to be "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D); *NRDC*,
18  146 F.3d at 1125, 1127; *see also Turtle Island Restoration Network v. Nat'l Marine Fisheries*
19  *Serv.*, 340 F.3d 969, 973 (9th Cir. 2003).

20      **B.      "Agency Action."**

21      Plaintiff argues that the AOP prepared by the Bureau each year constitutes agency
22  action and triggers the obligation to consult.  The Bureau disagrees, arguing that the AOP
23  constitutes nothing more than a report to Congress and relevant Governors on past and
24  projected Dam operations.[4]

25  _____

26      [4]The parties each cite a variety of Ninth Circuit cases to support their position, but
   neither side provides a broad review of relevant case law or principles.  The Court finds the
27  parties citations largely unhelpful in deciding this important question.  Several of the cited
   cases do not include any decision on the meaning of agency action for purposes of ESA
28  section 7, but include only a factual description of events or decisions that are not at issue in

The Ninth Circuit has issued a number of decisions on the agency action requirement. Some note that agency action is to be interpreted broadly to encompass any ongoing government conduct that has long-lasting effects. *See Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1053-54 (9th Cir. 1994); *see also NRDC*, 146 F.3d at 1125; *Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992). These cases rely on *TVA v. Hill*, 437 U.S. 153 (1978), a case in which the Supreme Court, while addressing substantive rather than procedural provision of ESA section 7, noted the broad language of the statute and observed that it admits of no exceptions. *See Pac. Rivers*, 30 F.3d at 1054; *NRDC*, 146 F.3d at 1125; *Lane County*, 958 F.2d at 294.

Recently, the Supreme Court revisited section 7 and declined to adopt a broad reading that would encompass virtually all actions by government agencies. *See Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 127 S. Ct. 2518, 2531-37 (2007). The Court found that the broad language of *TVA*, which was decided before the issuance of regulations construing the ESA (discussed below), was not controlling. *Id.* at 2536-37. Some Ninth Circuit cases have also held that the agency action definition is not unlimited in breadth. *See Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995); *Envt'l Protection Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1080 (9th Cir. 2000) ("*EPIC*").

The Court's task, then, is to determine the limits of agency action and apply them to this case. Several principles are relevant.

First and most obviously, agency action requires some "affirmative action" on the part of the agency. *Defenders of Wildlife v. EPA*, 420 F.3d 946, 967 (9th Cir. 2005), *rev'd on other grounds*, *Nat'l Ass'n of Home Builders*, 127 S.Ct. 2518. The ESA defines agency

the cases. *See, e.g.*, Dkt. #17 at 28 (citing *Pac. Coast Fed'n of Fishermen's Ass'n v. Gutierrez*, No. 1:06-CV-00245 OWW LJO, 2007 WL 1752289 (E.D. Cal. June 15, 2007); *Idaho Dep't of Fish & Game v. Nat'l Marine Fisheries Serv.*, 850 F. Supp. 886, 889 (D. Or. 1994), *vacated as moot*, 56 F.3d 1071 (9th Cir. 1995)); Dkt. #91 (citing *Forest Guardians v. Johanns*, 450 F.3d 455, 458 (9th Cir. 2006)). And some of the cited cases concern the "final agency action" rule under the APA, not the "agency action" requirement under the ESA. *See, e.g.*, Dkt. #91 (citing *Or. Natural Desert Ass'n v. U. S. Forest Serv.*, 465 F.3d 977, 984 (9th Cir. 2006)).

action to include actions "authorized, funded, or carried out by [an] agency[.]" 16 U.S.C. § 1536(a)(2). Implementing regulations provide several examples of affirmative action: "(a) actions intended to conserve listed species or their habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

Second, agency action must be discretionary. Implementing regulations state that ESA consulting obligations "apply to all actions in which there is *discretionary* federal involvement or control." 50 C.F.R. § 402.03 (emphasis added); *see* 50 C.F.R. § 402.16. The Supreme Court found this regulatory gloss on the statute to be reasonable and entitled to deference. *Nat'l Ass'n of Home Builders*, 127 S. Ct. at 2534. This gloss limits the meaning of agency action because "not every action authorized, funded, or carried out by a federal agency is a product of that agency's exercise of discretion." *Id*. The Ninth Circuit has also recognized this discretion requirement, noting that "[i]f no discretion to act is retained, the consultation would be a meaningless exercise." *Turtle Island*, 340 F.3d at 974. Thus, "'where there is no agency discretion to act, the ESA does not apply.'" *Id*. (quoting *NRDC*, 146 F.3d at 1125-26).

Third, not just any discretion will do. The Ninth Circuit has made clear that agency action occurs only when the discretion retained by the agency would enable the agency to take steps that benefit the protected species. This limitation has been recognized in numerous cases. *See Sierra Club*, 65 F.3d at 1509 (agency action does not occur if the agency "does not possess the ability to implement measures that inure to the benefit of the protected species"); *EPIC*, 255 F.3d at 1080 ("Under *Sierra Club* to survive a Rule 12(b)(6) motion to dismiss, [the plaintiff] must allege facts to show that the [agency] retained sufficient discretionary involvement or control . . . to implement measures that inure to the benefit of the [protected species]") (quotation marks and citation omitted); *Turtle Island*, 340 F.3d at 974 ("this court has held that the discretionary control retained by the federal agency must have the ability to inure to the benefit of the protected species"); *Wash. Toxics*, 413 F.3d at

1033 ("The ESA consultation requirement applies only if the agency has the discretionary control to inure to the benefit of a protected species." (quotation omitted)).  Even the retention of other kinds of discretion will not satisfy the agency action definition.  The discretion must enable the agency to take actions that would benefit the protected species. *See Sierra Club*, 65 F.3d at 1508-09 (BLM's discretion to alter rights-of-way on other grounds did not satisfy agency action requirement when BLM had not retained discretion to alter rights-of-way to benefit spotted owl); *EPIC*, 255 F.3d at 1082-83 (retention of "some" agency discretion not sufficient to trigger consultation requirement; discretion must allow agency to implement measures that inure to the benefit of the endangered species).[5]

## C.    Are AOPs Agency Actions?

Plaintiff argues that the Bureau makes monthly flow decisions in each year's AOP, that these decisions adopt the MLFF approach to operating the Dam, and that MLFF is the primary source of jeopardy to the humpback chub and its habitat.  Plaintiff argues that the Bureau could decide in the AOPs to adopt SASF, a regime that more closely tracks the natural hydrograph.  The Bureau's decision on this issue each year, Plaintiff contends, constitutes agency action that should be taken only in consultation with FWS.

The Bureau argues that the decision to adopt the MLFF regime is not made in the annual AOPs, but was instead made in 1996 following a full environmental impact study and consultation with FWS.  The Bureau also contends that the AOPs make projections, not decisions, regarding monthly flows, and that these projections are routinely modified as actual water conditions become known throughout the course of the year.

To decide which party is correct, the Court will review the history of Dam operation decisions and the nature of the AOPs.  Plaintiff's counsel agreed during oral argument that only the 2008 AOP is at issue in this case.

---

[5]The parties' memoranda fail to address this discretion requirement.  As the citations in the text make clear, however, the requirement is well established in Ninth Circuit law and must be applied by this Court.

### 1.   Dam Operation Decisions.

Glen Canyon Dam was authorized in 1954 and completed in 1963.  In 1968, Congress passed the Colorado River Basin Project Act ("1968 Act").  *See* 43 U.S.C. §§ 1501 *et seq*. The 1968 Act required the Secretary of the Interior to adopt criteria for the long-range operation of reservoirs on the Colorado River, including Glen Canyon Dam.  43 U.S.C. § 1552(b).  In addition, the 1968 Act required the Bureau to "transmit to the Congress and to the Governors of the Colorado River Basin States a report describing the actual operation under the adopted criteria for the preceding compact water year and the projected operation for the current year."  43 U.S.C. § 1552(b).  Long Range Operating Criteria ("LROC") were adopted by the Secretary of the Interior on June 4, 1970.  *See* 35 Fed. Reg. 8951-02 (June 10, 1970).  The LROC have remained largely unchanged.  *See* 70 Fed. Reg. 15873, 15874 (Mar. 29, 2005).  They establish a minimum annual water release from Lake Powell of 8.23 million acre feet, and specify conditions under which greater releases may be made to equalize water storage between Lake Powell and Lake Mead.  *Id*. at 15875.[6]

In 1992, Congress enacted the Grand Canyon Protection Act ( "1992 Act").  *See* Pub. L. No. 102-575, 106 Stat. 4600, §§ 1801-1809.  The 1992 Act required the Bureau to complete a Dam environmental impact statement ("EIS") that was then underway.  *Id.* § 1804(a).  Congress also required the Bureau, upon completion of the EIS, to adopt Operating Criteria for the Dam.  *Id.* § 1804(c).  The 1992 Act required the Bureau to "transmit to the Congress and to the Governors of the Colorado River Basin states a report . . . on the preceding year and the projected year operations undertaken pursuant to this Act."  *Id*.

Consistent with these requirements, a final environmental impact statement for Glen Canyon Dam operations was completed on March 21, 1995 (the "FEIS").  The FEIS considered several alternative approaches to operating the Dam.  These alternatives "were

---

[6]An "acre foot" of water is the amount of water needed to cover one acre of land to a depth of one foot.  It amounts to 43,560 cubic feet of water, or about 325,851 gallons. A million acre feet or "maf" is one million times this amount.

formulated through a systematic process using public input, technical information, interdisciplinary discussions, and professional judgement." Dkt. #122-2 at 3. The FEIS team developed 10 preliminary water-release alternatives and divided them into three general categories – fluctuating flows, steady flows, and flows mimicking pre-dam conditions. The preliminary alternatives were published in 1991 and a series of public meetings was held to discuss them. Following the meetings, the FEIS team formulated nine water-release alternatives for detailed study. These included (1) no action (i.e., no change in Dam operations), (2) maximum power plant capacity, (3) high fluctuating flow, (4) moderate fluctuating flow, (5) modified low fluctuating flow (MLFF), (6) interim low fluctuating flow, (7) existing monthly volume steady flow, (8) seasonally adjusted stead flow (SASF), and (9) year-round steady flow.

To understand the MLFF approach that ultimately was adopted by the Bureau, and the SASF alternative favored by Plaintiff, one must first understand how the Dam was operated before the FEIS. Existing Dam operations were considered by the FEIS in the No Action Alternative – the alternative that would have made no change to operations. The objective of the existing operations was to generate as much electricity as possible given the needs of the power system. *Id.* at 7. Under this approach, "[f]luctuating releases occur . . . to follow power system load changes, to produce peaking power, to regulate the power system, or to respond to power system emergencies." *Id*.

Monthly release volumes under the No Action Alternative were described in the FEIS as follows:

> [T]he volume of water released from Lake Powell each month depends on forecasted inflow, existing storage levels, monthly storage targets, and annual release requirements. Demands for electrical energy, fish and wildlife needs, and recreation needs also are considered and accommodated as long as the risk of spilling and storage equalization between Lakes Powell and Mead are not affected.
>
> Power demand is highest during winter and summer months, and recreation needs are highest during the summer. Therefore, the higher volume releases are scheduled during these months whenever possible to benefit these uses.

*Id*. A chart following this explanation provided a graphic illustration of the monthly releases

during the low water year of 1989.  The chart shows higher releases in the winter and summer and lower releases in the spring and fall.

The FEIS described the MLFF approach in these words:

> The Modified Low Fluctuating Flow Alternative was developed to reduce daily flow fluctuations well below no action levels and to provide special high steady releases of short duration, with the goal of protecting or enhancing downstream resources while allowing limited flexibility for power operations. *This alternative would have the same annual and essentially the same monthly operating plan as described under the No Action Alternative but would restrict daily and hourly operations more than any of the previously described fluctuating flow alternatives.*

*Id*. at 16 (emphasis added).  The MLFF alternative thus included the same monthly pattern of water releases as the existing Dam operation – higher releases in the peak power-demand months of the winter and summer, and lower releases in the spring and fall.  This characteristic of MLFF was illustrated in the FEIS projections of median monthly releases – .586 maf in the fall, .899 maf in the winter, .587 maf in the spring, and 1.045 maf in the summer.  *Id*. at 46.  The key difference between the No Action alternative and the MLFF was that the MLFF significantly reduced the daily fluctuations in water releases from the Dam.  The MLFF also included habitat maintenance flows intended "to re-form backwaters and maintain sandbars, which are important for camping beaches and wildlife habitat."  *Id*.

The SASF alternative was quite different.  It did not consider the need for power production, but instead "was developed to enhance the aquatic ecosystem by releasing water at a constant rate within defined seasons and by using habitat maintenance flows.  Seasonal variations in minimum flows and habitat maintenance flows were designed with the goal of protecting and enhancing native fish."  *Id*.  Water releases under the SASF alternative would be steady throughout any given month, but total monthly releases would be higher in the spring and lower in the summer and fall to more closely track the natural hydrograph.  As the FEIS explained, "[t]his alternative would provide steady flows on a 1- to 3-month basis, providing seasonal variations throughout the year to meet downstream resource needs.  The highest releases would occur in May and June, with relatively low releases from August through December."  *Id*. at 21.  These characteristics of the SASF were illustrated in the FEIS

1   projections of median monthly releases  – .492 maf in the fall, .688 maf in the winter, 1.106
2   maf in the spring, and .768 maf in the summer.  *Id*. at 47.

3       The differences between the MLFF and SASF are significant.  Although they would
4   fluctuate through the day, total monthly flows under the MLFF would be low in the spring
5   and high in the late summer to correspond to electricity demand, while monthly flows under
6   the SASF would be the opposite – high in the spring and low in the late summer to
7   approximate the natural flows.  These differences are illustrated in a chart attached to the
8   FEIS.  April water releases under MLFF are projected to total .512 maf, while April releases
9   under SASF would be .723 maf.  Dkt. #27-6 at 26.  May would be .504 maf for MLFF and
10   1.073 maf for SASF.  August would be .848 maf under MLFF and .474 maf under SASF.
11   *Id*.  The point is simply this: MLFF and SASF produce very different monthly flows, and
12   these differences were fully understood and considered by the Bureau in the FEIS.

13       The FEIS found MLFF to be the preferred alternative.  The Secretary of the Interior
14   accepted this recommendation and selected MLFF as the operating system for the Dam in
15   a Record of Decision signed on October 8, 1996 ("1996 ROD").  As the ROD announced:
16   "The Secretary's decision is to implement the Modified Low Fluctuating Flow Alternative
17   (the preferred alternative) as described in the final EIS on the Operation of Glen Canyon
18   Dam with a minor change in the timing of beach/habitat building flows.[.]"  Dkt. #27, Ex.
19   3 at G-3.

20       The Bureau then established Operating Criteria for the Dam as required by Congress
21   in the 1992 Act.  Notice of the new criteria was published in the Federal Register.  *See* 62
22   Fed. Reg. 9447 (Mar. 3, 1997).  The notice stated that the Operating Criteria would "control
23   the operation of Glen Canyon Dam[.]"  *Id*.  The notice described the "Specific Operational
24   Constraints" for the Dam as follows:  "The plan of operations will follow the description of
25   the preferred alternative (Modified Low Fluctuating Flow) in the Operation of Glen Canyon
26   Dam Final Environmental Impact Statement and its Record of Decision."  *Id*. § 3.

27       The salient points from this history can be summarized as follows: The Bureau
28   formally established Operating Criteria for Glen Canyon Dam under the direction of

Congress.  The Operating Criteria adopt a MLFF flow regime that includes fluctuating flows to meet power demands within established limits.  Although precise monthly flow volumes are not set in the Operating Criteria – they could not be set given the uncertainties of yearly precipitation and power demands – the MLFF presumes higher flows in the winter and summer months and lower flows in the spring and fall months, a very different pattern than the SASF that was considered and rejected in the FEIS.  The Operating Criteria are based on the ROD signed by the Secretary of the Interior, have been published in the Federal Register, and, in the words of the Bureau, "control the operation" of the Dam.  62 Fed. Reg. 9448 (Mar. 3, 1997).  Against this backdrop, the Court will consider the nature of the 2008 AOP.

### 2.    The 2008 AOP.

The AOP concerns more than Glen Canyon Dam.  It addresses the operations of several reservoirs in the Colorado River Basin including Fontenelle, Flaming Gorge, Blue Mesa, Morrow Point, Crystal and Navajo, Lake Mead, and Lake Powell.  Releases from these reservoirs are described for the year 2007.

The 2008 AOP then sets forth projected releases from these reservoirs for the water year 2008, which extends from October 2007 through September 2008.  The AOP makes clear that the projections are just that – projections – and that they are based on forecasted in-flows and the criteria established in the 1996 ROD and the Operating Criteria.  The Bureau's use of projections comports with the 1968 Act and the 1992 Act, both of which require the Bureau to prepare annual reports that include "projected" operations for the next water year.  *See* 43 U.S.C. § 1552(b); Pub. L. No. 102-575, § 1804(c).  The AOP makes clear that actual releases from the Dam will be governed by the MLFF flow regime adopted in the ROD and the Operating Criteria: "Daily and hourly releases in 2008 will be made according to the parameters of the ROD for Glen Canyon Dam . . . and the Glen Canyon Dam Operating Criteria[.]"  Dkt.#27, Ex. 2 at 18.

Table 6 of the 2008 AOP sets forth projected monthly releases under the most probable inflow conditions.  The releases track the MLFF pattern considered in the FEIS, with the highest months being in the winter and summer and the lowest in the spring and fall.

Projected releases vary from .600 maf in October of 2007 to .900 maf in August of 2008. Alternative projected releases are shown if the Bureau decides to undertake a high flow experiment in February and March.  The AOP explains the tentative nature of these numbers: "Since the hydrologic conditions of the Colorado River Basin can never be completely known in advance, the AOP addresses the operations resulting from three different hydrologic scenarios:  the probable maximum, most probable, and probable minimum reservoir inflow conditions.  River operations under the plan *are modified during the year* as runoff predictions are adjusted to reflect existing snow pack, basin storage, and flow conditions."  *Id.* at 2 (emphasis added).  This need to modify release amounts as the year progresses was recognized by the Bureau in the FEIS:  "Each month during the inflow forecast season (January to July), the volume of water to be released is recomputed based on updated streamflow forecast information."  Dkt. #122-2 at 7.

### D.     Conclusion – the AOP Is Not an Agency Action.

Plaintiff asserts that the AOP is the place where monthly flow decisions are made. This is not correct.  The AOP makes projections, fully contemplating that actual releases from the Dam will differ from projections and will be computed only as the water year progresses.  Thus, to the extent Plaintiff contends that it is the actual releases from the Dam that constitute agency action, those releases are not determined in the 2008 AOP.  The AOP is an educated guess of what the releases will be when conditions are known.

Plaintiff cites statements in various documents which suggest that annual water release decisions are made in the AOP.  The Court does not find these statements  convincing because the 2008 AOP clearly makes projections.  Actual release decisions are made during the course of the year.  And in any event, it is not the real-time release decisions about which Plaintiff complains.  Those decisions are made daily as conditions change, and yet Plaintiff has not suggested that every daily decision to increase or decrease flow from the Dam requires consultation with FWS.  Plaintiff's true complaint is with the Bureau's use of the MLFF system, a decision made in the ROD and Operating Criteria, not in the AOP.

The Court also concludes that the Bureau does not exercise discretion in the AOP that

could inure to the benefit of the humpback chub.  The benefit Plaintiff has identified – the change Plaintiff seeks in the AOP – is adoption of the SASF system.  But the Bureau does not have discretion to adopt SASF in the AOP.  The Secretary of the Interior decided to adopt the MLFF system (and not to adopt the SASF system) in the 1996 ROD.  The MLFF was also chosen as the controlling method of dam operations in the Operating Criteria that Congress required to be established.  Plaintiff has cited no authority to show that the Bureau has discretion to countermand a decision of the Secretary of the Interior through an AOP that projects water release levels for the coming year.[7]

The Ninth Circuit has stated that agency action exists "when the agency engages in an affirmative action that is both within its decisionmaking authority *and unconstrained by earlier agency commitments*."  *Defenders of Wildlife*, 429 F.3d at 967 (emphasis added).  The Ninth Circuit has further explained that "section 7(a)(2) [is] inapplicable where the challenged action was *legally foreordained by an earlier decision*, such as where the agency lacked the ability to amend an already-issued permit 'to address the needs of endangered or threatened species.'"  *Id*. at 968 (quoting *EPIC*, 255 F.3d at 1082) (emphasis added).  The Secretary's selection of MLFF in the ROD and the issuance of the Operating Criteria

---

[7]That Plaintiff seeks abandonment of MLFF and adoption of SASF through the AOP is clear from Plaintiff's briefs.  *See*, *e.g.*, Dkt. #17 at 30 (the MLFF "flow patterns bear little resemblance to historic seasonal flows and the natural hydrograph . . . ; natural seasonal flows are characterized by large floods in the spring and low flows in the late summer and fall"); Dkt. #91 at 36 (the MLFF "'annual pattern of monthly volumes released from the dam (with peak daily flows at their highest during the summer sediment input months of July and August) is the <u>greatest</u> <u>factor</u> preventing accumulation of new sand inputs from tributaries[.]'") (quoting Ex. 22, 2007 USGS report) (emphasis added by Plaintiff); *id*. at 37 ("[l]ower flows in July and August, in contrast, allow sediment to settle and create sandbars and backwater habitats for the humpback chub"); *id*. ("low flows in July and August that mimic the natural hydrograph are even more important than usual this year because they would allow the sediment washed down the river by the March high flows to settle and form backwater habitats"); *id*. ("[a] seasonally adjusted flow scenario would accomplish this as would the proposed maintenance flows described in the 1995 EIS"); Dkt. #121 at 2 ("the monthly pattern necessary to implement a Seasonally-Adjusted Steady Flow (SASF) regime – one adhering to the river's natural seasonal hydrograph – would be within the range of monthly volumes permitted under the 1996 ROD").

constrain the discretion of the Bureau and foreordain the use of MLFF in the AOP.[8]

The Ninth Circuit's decisions in *Sierra Club* and *EPIC* are examples of where an agency's prior actions eliminated its discretion to take actions that would inure to the benefit of the protected species.  In *Sierra Club*, BLM entered into agreements that allowed roads to be built in certain rights-of-way unless BLM objected on one of three specified grounds.  Because protection of the spotted owl was not one of these grounds, the Ninth Circuit held that BLM did not retain discretion to take actions that would inure to the benefit of the spotted owl and that the consultation obligation under the ESA therefore did not arise.  65 F.3d at 1507-09.  In *EPIC*, the Ninth Circuit held that FWS did not retain discretion to protect two species when it issued an incidental take permit with respect to another species, and that FWS therefore was not obligated to reopen consultations under the ESA.  255 F.3d at 1079-82.  Although subsequent Ninth Circuit decisions have noted that the agency actions in these cases were completed and not ongoing, *Turtle Island*, 340 F.3d at 977, the Court does not find that this fact distinguishes them from this case.  The Bureau made the MLFF decision in 1996 and 1997 after a formal FEIS process.  The decision is not made annually in the AOPs.  The Bureau therefore lacks discretion to adopt the SASF system in the AOPs just as BLM and FWS lacked discretion as a result of their previous decisions.

In summary, the Court concludes that the 2008 AOP does not constitute the kind of affirmative agency action contemplated by the language of the statute or the implementing regulations.  Nor does it constitute an exercise by the Bureau of discretion that could inure to the benefit of the humpback chub.  Plaintiff's complaint is with the adoption of MLFF in the ROD and the Operating Criteria.  Plaintiff cannot redress this concern by asserting that the Bureau should consult with FWS before making projections in the AOP each year.  The

---

[8]To the extent the Bureau has recently modified its release practices by adopting certain experimental steady flows, those decisions were made outside of the AOP process and in consultation with FWS.  Although Plaintiff contends that the consultation resulting in the 2008 biological opinion was legally flawed, the important point is that the decision to modify the flow regime was not made in the AOP, but in a separate deliberation.

Bureau's decision not to consult with FWS in preparation of the 2008 AOP was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, nor was it without observance of procedures required by law.  5 U.S.C. § 706(2)(A), (D).  Summary judgment on this claim will be granted in favor of Defendants.

**VI.    Claim 5.**

NEPA directs federal agencies to prepare a detailed environmental impact statement in connection with every "major Federal action significantly affecting the quality of the human environment[.]"  42 U.S.C. § 4332(c).  An agency may prepare an "environmental assessment" ("EA") to determine whether the environmental impact of the proposed action is sufficiently significant to warrant an EIS.  *See* 40 C.F.R. § 1508.9.  If the EA indicates that the agency's action "may have a significant effect upon the . . . environment, an [EIS] must be prepared."  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018 (9th Cir. 2007) (citation omitted).  "If the proposed action is found to have no significant effect, the agency must issue a finding to that effect . . . , accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant."  *Id*. (internal quotes and citation omitted).

The Bureau prepared an EIS before the 1996 ROD, but does not prepare one when issuing an AOP each year.  Plaintiff contends that the Bureau's failure to do so violates § 4332(c).

Major federal actions are defined to "includ[e] actions with effects that may be major and which are potentially subject to Federal control and responsibility."  40 C.F.R. § 1508.18.  Major federal actions generally fall within one of the following categories: official policy, formal plans, formal programs, or specific projects.  *Id*. at § 1508.18(b).  Plaintiff argues that the AOP contains a determination of monthly water flows and therefore is a major federal action.

While "an EIS need not discuss the environmental effects of mere continued operation of a facility," *Burbank Anti-Noise Group v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir.1980), "'major Federal actions' include the expansion or revision of ongoing programs," *Andrus v. Sierra Club*, 442 U.S. 347, 363 n.21 (1979) (internal quotes and alteration omitted).  The

Bureau argues that the AOP's projection of releases is merely an ongoing operation.

The Ninth Circuit has held that a major federal action for purposes of NEPA is similar to an agency action under the ESA, but that the major federal action requirement is more demanding. *See Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996). Thus, if the AOP is not an agency action under the ESA, as shown above, *a fortiori* it is not a major federal action. Case law confirms this conclusion.

In *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232 (9th Cir. 1990), the Ninth Circuit held that the Bureau's decisions to reduce releases from the Palisades Dam into the South Fork of the Snake River did not constitute a major federal action under NEPA. The Court held that such decisions, even when they significantly lowered water levels to the likely detriment of trout in the river, "were no more than the routine managerial actions regularly carried on from the outset [of the dam's operation] without change." *Id*. at 235. The Ninth Circuit held that the defendants were "simply operating the facility in the manner intended. In short, they are doing nothing new, nor more extensive, nor other than that contemplated when the project was first operational." *Id*.

Similarly, in *County of Trinity v. Andrus*, 438 F.Supp. 1368 (E.D. Cal.1977), the district court ruled that lowering the level of a reservoir during the drought year of 1977, although an action that would potentially damage fish in the reservoir, was not a major federal action. The Court noted that:

> The Bureau has neither enlarged its capacity to divert water from the Trinity River nor revised its procedures or standards for releases into the Trinity River and the drawdown of reservoirs. It is simply operating the Division within the range originally available pursuant to the authorizing statute, in response to changing environmental conditions.

*Id*. at 1388-89. The Ninth Circuit quoted this language and adopted this rationale in *Upper Snake River*. 921 F.2d at 235.

As noted above, the 1996 ROD and Operating Criteria – issued only after full NEPA review – adopted the MLFF as the controlling program for Glen Canyon Dam. The AOP projects monthly releases under the MLFF system on the basis of anticipated inflows to Lake Powell. Like the dam releases in *Upper Snake River* and *County of Trinity*, the AOP's

- 26 -

projections constitute operations within the planned limits of the project and in response to changing environmental conditions.  They are not, therefore, major federal actions within the meaning of NEPA.[9]

Plaintiff attempts to distinguish *Upper Snake River* on the ground that Palisades Dam was built before the enactment of NEPA.  But this was not the basis for the Ninth Circuit's decision.  The question addressed by the Ninth Circuit was whether the Bureau's *post-NEPA* operations of the dam included "changes [in dam operations] which *themselves* amount to 'major Federal actions.'" 921 F.2d at 234 (emphasis added).  The Court of Appeals held that reducing releases from the dam in response to drought conditions did not constitute major federal action.  Likewise, Glen Canyon Dam releases made in response to environmental conditions do not constitute major federal action.[10]

Plaintiff argues that the Bureau's use of the NEPA process in connection with 1996 beach building experimental releases, a 2002 removal of non-native fish, and adoption of a 2008 Experimental Plan shows that NEPA review should also be completed for each AOP.  But none of these actions were AOPs.  More importantly, the question the Court must answer is whether AOP is a major federal action under the law, not under prior Bureau practices.

---

[9]Plaintiff argues that more than environmental conditions are considered in the AOP monthly flow projections.  Although this surely is true, it does not distinguish this case from *Upper Snake River*.  Like Glen Canyon Dam, the Palisades Dam was constructed pursuant to an act of Congress and was part of a much larger project, the purposes of which were to "control and conserve the waters of the River for fish and wildlife, recreation, irrigation, flood control, and power generation." 921 F.2d at 233.  The Bureau was thus faced with many considerations when making release decisions for the Palisades Dam, just as it is with Glen Canyon Dam, and yet the Ninth Circuit held that those operational decisions were not major federal actions under NEPA.

[10]If anything, this would appear to be a stronger case for the Court's conclusion.  The dam operations in *Upper Snake River* and *County of Trinity* had not undergone prior NEPA review.  In this case, as Plaintiff concedes, the Bureau "did undergo NEPA review for Glen Canyon Dam operations, initially of its own volition and later because Congress directed a NEPA review through the Grand Canyon Protection Act." Dkt. #91 at 43.  Thus, the ROD and Operating Criteria with which the AOP must comply have themselves been subjected to NEPA review, rendering even more comfortable the conclusion that the AOP does not itself constitute a new major federal action.

Under the authority of *Upper Snake River* and *County of Trinity*, it is not.

Plaintiff further contends that the AOP is a major federal action because it is mandated by Congress and therefore "not simply part of the routine Glen Canyon Dam operations[.]" Dkt. #91 at 43.  But the fact that the AOP is regularized by Congress does not mean that it is not part of routine dam operations.  Moreover, the 1992 Act that required the AOP also required completion of an EIS for the overall dam operations.  Pub. L. No. 102-575, § 1804(a).  Congress did not similarly require completion of an EIS for each AOP.

The Court will enter summary judgment in favor of Defendants on Claim 5.  Given this decision, the Court need not address Defendants' arguments regarding exhaustion and the infeasibility of NEPA compliance for AOPs.

**VII.    Further Proceedings.**

As made clear at the oral argument and in supplemental briefing, Plaintiff and Defendants agree that the merits of this case may be decided by summary judgment.  Having concluded that this case is subject to APA review on the administrative record, the Court agrees.  The issue to be decided – whether the agencies have acted arbitrarily or capriciously or in violation of law – is a question of law suitable for resolution by summary judgment. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985); *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir. 1964).  The Court therefore will establish a briefing schedule.  Although Plaintiff initially urged the Court to postpone the briefing of remedies until the merits have been resolved, the Court concludes that Plaintiff's proposed remedies should be addressed with the merits of claims 6, 7, and 8.

**IT IS ORDERED:**

1.    Plaintiff's motion for summary judgment (Dkt. #15) is **denied** with respect to claims 4 and 5 of Plaintiff's supplemental complaint.  The motion with respect to claims 1, 2, and 3 will be decided after briefing is completed on claims 6, 7, and 8.

2.    The Bureau's motion to dismiss and alternative cross-motion for summary judgment (Dkt. #25) is **granted** with respect to claims 4 and 5 of the supplemental complaint and denied – to the extent it seeks dismissal – with respect to claims 1, 2, and 3.  The cross-

1  motion for summary judgment with respect to claims 1, 2, and 3 will be decided after briefing

2  is completed on claims 6, 7, and 8.

3         3.    Additional motions and briefing shall be submitted as follows:

4          a.    Plaintiff shall file its motion for summary judgment with respect to

5  claims 6, 7, and 8, and with respect to remedies, by **November 14, 2008**.

6          b.    The Bureau and FWS shall file their consolidated opposition brief and

7  cross-motion for summary judgment, or judgment on the pleadings, by **December 19, 2008**.

8          c.    Intervernors shall file response briefs or joinders to the motion filed by

9  the Bureau and FWS by January 9, 2009.

10          d.    Plaintiff shall file its reply brief by **January 30, 2009**.

11          e.    The Bureau, FWS, and Intervenors shall file their reply briefs by

12  **February 20, 2009**.

13          f.    Plaintiff's and Defendants' opening and opposition briefs, including the

14  briefing of remedies, shall not exceed 40 pages (and shall be considerably shorter if

15  possible).  Reply briefs shall not exceed 20 pages (and shall be considerably shorter if

16  possible).  Any briefs filed by Intervenors shall comply with the Court's Local Rules.

17          g.    Pursuant to stipulation of the parties (Dkt. #115), the administrative

18  record for claim 8 shall be comprised of the documents previously filed by the Bureau and

19  Defendants shall not file any additional administrative record documents with respect to

20  claim 8.

21          h.    The Court concludes that additional briefing should occur with respect

22  to claims 1, 2, and 3.  Plaintiff and Defendants shall file memoranda, not to exceed 20 pages

23  in length, on or before **February 20, 2009**, addressing the merits of claims 1, 2, and 3 under

24  the APA standard of review.  Specifically, on what basis should the Court conclude or not

25  conclude that the Bureau's operation of the Dam is "arbitrary, capricious, an abuse of

26  discretion, or otherwise not in accordance with law," or "without observance of procedure

27  required by law"? 5 U.S.C. § 706(2)(A), (D).  Documents cited in the memoranda shall be

28  limited to the administrative record or shall be submitted under an explained exception to the

1   administrative record requirement.  If the parties cite to a document already submitted to the

2   Court as an exhibit to the current briefing, they should provide a docket number and exhibit

3   number citation (*i.e.*, Dkt. #27, Ex. 2).  If the parties cite to additional documents not

4   submitted to the Court as exhibits to the current briefing, they should provide the Court with

5   copies of those documents appropriately marked as exhibits to their memoranda.

6           DATED this 26th day of September, 2008.

7

8

9   _____

10                     David G. Campbell
                    United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28