**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Grand Canyon Trust, | No. CV-07-8164-PHX-DGC |
| Plaintiff, | **ORDER** |
| vs. | |
| U.S. Bureau of Reclamation, et al., | |
| Defendants. | |

This case concerns the United States Bureau of Reclamation's operation of Glen Canyon Dam on the Colorado River. Plaintiff Grand Canyon Trust claims that Reclamation is violating the Endangered Species Act ("ESA") in its operation of the Dam. Specifically, the Trust alleges that Reclamation's operation of the Dam under a moderate low fluctuating flow regime ("MLFF") jeopardizes and takes the endangered humpback chub and adversely modifies its critical habitat. The Trust also claims that Reclamation and the United States Fish and Wildlife Service ("FWS") have failed to comply with relevant federal statutes, including the National Environmental Policy Act ("NEPA"), the Administrative Procedure Act ("APA"), and the ESA.

For the reasons that follow, the Court will deny the Trust's motion to vacate the Court's previous rulings on Claims 1, 2, and 9, and will deny the Trust's motion for summary judgment on Claims 3, 12, and 13. The Court will grant summary judgment to the Defendants on Claims 3, 12, and 13. Because this ruling will resolve all outstanding claims, the Court will direct the Clerk to terminate this case.

**I.     Background.**

The Court has issued three previous orders addressing the merits of this case: *Grand Canyon Trust v. United States Bureau of Reclamation*, No. CV-07-8164-PCT-DGC, 2008 WL 4417227 (D. Ariz. Sept. 26, 2008) (*Trust I*); *Grand Canyon Trust v. United States Bureau of Reclamation*, 623 F. Supp. 2d 1015 (D. Ariz. 2009) (*Trust II*); and *Grand Canyon Trust v. United States Bureau of Reclamation*, No. CV-07-8164-PHX-DGC, 2010 WL 2643537 (D. Ariz. June 29, 2010) (*Trust III*).  This order presumes familiarity with the facts, analysis, and holdings of *Trust I*, *II*, and *III*.

In its most recent decision – *Trust III* – the Court granted in part and denied in part the Trust's motion for summary judgment on Claim 9 and granted summary judgment to Reclamation and FWS on Claims 1, 2, 10, and 11.  *Id*.  The Court remanded the 2009 Incidental Take Statement ("ITS") to FWS for further consideration and deferred ruling on Claim 3 until the 2009 ITS had been reconsidered.  *Id.*

FWS re-issued the ITS on September 1, 2010 (the "2010 ITS").  Doc. 255-1.[1]  The 2010 ITS replaced the 2009 ITS.  Doc. 255-1 at 1.  Dissatisfied with the 2010 ITS, the Trust supplemented its complaint to include two more claims: Claim 12, asserting that the 2010 ITS violates the ESA, and Claim 13, asserting that the 2010 ITS violates NEPA.  Doc. 264.

On October 1, 2010, the Trust filed a motion for summary judgment on Claims 3, 12, and 13.  Doc. 265.  The Trust also filed a motion to vacate the Court's order in *Trust III* on Claims 1, 2, and 9.  Doc. 266.  The Trust later moved to withdraw these motions in light of a development in Dam operations.

The Dam currently is being operated under a 2008 Experimental Plan that has been discussed at length in the Court's previous orders.  One of the chub conservation measures being implemented by Reclamation under the plan is the mechanical removal of rainbow trout – a nonnative to the Colorado River that preys on the chub.  Due to concerns expressed

---

[1] The September 1, 2010 ITS, which will be referred to in this order as the "2010 ITS," but should not be confused with another ITS included by FWS on November 9, 2010, concerning cancellation of the 2010 mechanical removal of trout.  Doc. 274-1 at 20.

1  by the Zuni Tribe, Reclamation cancelled the mechanical trout removal trips scheduled for
2  May and June of 2010. Doc. 222. This cancellation resulted in renewed consultation
3  between FWS and Reclamation, and in November of 2010 FWS issued a new Biological
4  Opinion and ITS that specifically addressed the cancellation of the trout removal. Doc. 274.
5  　　　　In response to this new Biological Opinion and ITS, the Trust moved to withdraw its
6  October motions so that it could again modify its claims. Doc. 275. The Court granted the
7  motion to withdraw. Doc. 282. However, during a telephone conference in February of 2011
8  (Doc. 285), the Trust changed its mind in light of a discussion concerning the future schedule
9  of this case. Federal Defendants explained during the conference that FWS and Reclamation
10 currently are in consultation regarding mechanical trout removal for the years after 2010, and
11 that this consultation likely will produce additional agency documents in May or June of this
12 year. Rather than waiting to file additional claims once these new documents are produced,
13 the Trust suggested that the Court simply rule on the motion to vacate and motion for
14 summary judgment that had been filed on October 1, 2011 and later withdrawn. After
15 considering this suggestion, the Court agreed. Doc. 286.
16 　　　　This order will therefore address the motion for summary judgment dated October 1,
17 2011 and subsequent briefing. Docs. 266, 267, 271-73. The Court will also address the
18 motion to vacate. Doc. 265. Given the Court's familiarity with this case, oral argument is
19 not necessary.
20 **II.  Standard for Review.**
21 　　　　The ESA and NEPA do not provide standards for judicial review of agency actions.
22 Therefore, the Court must evaluate the administrative decisions of Reclamation and FWS
23 using the APA. *See Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007)
24 (ESA claims reviewed under APA); *Akiak Native Cmty. v. USPS*, 213 F.3d 1140, 1146 (9th
25 Cir. 2000) (NEPA claims reviewed under APA).
26 　　　　A court may set aside an agency's decision under the APA only if the decision is
27 "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5
28 U.S.C. § 706(2)(A); *Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine Fisheries Serv.*,

1  265 F.3d 1028, 1034 (9th Cir. 2001). An agency's decision is not arbitrary and capricious
2  if the agency "articulated a rational connection between the facts found and the choice
3  made." *Ariz. Cattle Growers' Ass'n v. USFWS (Ariz. Cattle I)*, 273 F.3d 1229, 1236 (9th Cir.
4  2001). The APA standard is "highly deferential, presuming the agency action to be valid and
5  affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem*
6  *Alliance v.USFWS*, 475 F.3d 1136, 1140 (9th Cir. 2007) (internal quotes and citation
7  omitted). "The reviewing court is not empowered to substitute its judgment for that of the
8  agency." *Ariz. Cattle I*, 273 F.3d at 1236.

9  **III.    The Motion to Vacate.**

10  The Trust asks the Court to vacate its *Trust III* ruling on Claims 1, 2, and 9. The
11  motion is based on Reclamation's decision to cancel mechanical trout removal in May and
12  June of 2010. The Trust contends that this cancellation rendered the 2009 Biological
13  Opinion invalid and requires that the Court's prior rulings on Claims 1, 2, and 9 be vacated.
14  Doc. 267 at 9. The Court does not agree.

15          **A.    Dam Operations Continue Under a Valid Biological Opinion.**

16  The Trust argues that nonnative fish removal was fundamental to FWS's 2009
17  Biological Opinion, that the 2010 cancellation has fundamentally undermined the validity
18  of the 2009 Biological Opinion, that FWS has issued no new Biological Opinion, that Dam
19  operations therefore are occurring without a valid Biological Opinion, and that the basis for
20  *Trust III*'s ruling on Claims 1, 2, and 9 has been eliminated. Doc. 267 at 7-8. In the months
21  since the Trust first made this argument, FWS has issued a supplemental Biological Opinion
22  and ITS (the "2010 Biological Opinion"). Doc. 274. The Court subsequently addressed a
23  different motion to vacate filed by the Trust (Doc. 277), and held that the 2010 Biological
24  Opinion did not supersede the 2009 Biological Opinion and ITS but instead supplemented
25  them (Doc. 284). The Court held that 2010 Biological Opinion did not undermine the basis
26  for *Trust III*, and therefore declined to vacate *Trust III*. *Id.* The Court stands by that
27  decision.

28

**B.     Other Arguments.**

The Trust argues that predation by rainbow trout constitutes a substantial threat to the humpback chub, that FWS relied heavily on mechanical trout removal in its 2009 Biological Opinion, that FWS and Reclamation have re-initiated consultation due to cancellation of the 2010 removal trips, and that the Court therefore should vacate its rulings on Claims 1, 2, and 9 in *Trust III*. Doc. 267 at 9-13. The Court agrees that predation by rainbow trout has been identified as a substantial threat to the chub and that the mechanical removal of trout has been viewed as a significant component of chub preservation and recovery. The Court also agrees that the prospect of discontinuing the mechanical removal of trout raises serious questions about potential adverse effects on the chub. For several reasons, however, the Court does not conclude that the cancellation of the 2010 removals requires that the Court's previous decisions on Claims 1, 2, and 9 be vacated.

First, FWS and Reclamation have completed their renewed consultation concerning cancellation of the removal trips scheduled for May and June of 2010, and FWS has opined that cancellation of those two trips will not jeopardize or improperly take the chub, or adversely modify its critical habitat. Doc. 274. The Trust has not challenged this 2010 Biological Opinion. *See* Doc. 273 at 12 ("the Trust's October 1, 2010 Motion does not challenge the 2010 Biological Opinion").[2]

Second, although predation by trout has been identified as a significant risk factor for the chub, the science does not support a conclusion that the chub population will decline merely because the mechanical removal of trout has been cancelled for one year. Studies suggest that the chub population began to increase before mechanical trout removal was

---

[2] The Court recognizes that the Trust planned to challenge the new opinion if further proceedings in this case were to occur, but the Trust instead elected to have the Court rule on its October 1, 2010 motions. Doc. 286. Because the Trust has not challenged the 2010 Biological Opinion and has provided no basis for setting it aside, the Court will accept the opinion at face value – the cancellation of trout removal in May and June of 2010 will not jeopardize or improperly take the chub, or adversely modify its critical habitat.

- 5 -

1  commenced, suggesting that the increase was due to factors other than, and independent of,

2  trout removal. As the 2009 Biological Opinion explained:

> The [increase in chub population] was due to an increase in recruitment that began before many actions predicted to improve [chub] status such as mechanical removal of nonnative fishes or warming of mainstem water temperatures in the Colorado River. Mainstem warming and mechanical removal effects both started in 2003 and could have begun affecting the abundance of age-2 recruits in 2004 and later, (brood-years 2002 and later). But the increase in recruitment appears to have at least doubled from the mid-1990s before the population was exposed to warmer Colorado River water temperatures and reduced nonnative abundance near the mouth of the LCR.

Doc. 180-1 at 36. If chub population increases were occurring before trout removal, the Court cannot conclude that the population suddenly will decrease when one year's removal effort is cancelled.

Third, the parties were well aware of the 2010 cancellation before briefing the issues addressed in *Trust III*. *See* Doc. 222. The cancellation was addressed in the briefing and in *Trust III*:

> The Trust notes that the mechanical removal of rainbow trout planned for May and June of 2010 was postponed by Reclamation in response to concerns expressed by the Zuni Tribe of the Zuni Indian Reservation. The Zuni Tribe regards the confluence of the [Little Colorado River] and mainstem as sacred, and objects to the mass killing of trout in such a location. In response to this concern, Reclamation postponed the 2010 fish removal pending further consultations with FWS and the Zuni Tribe. This experience aptly illustrates the complex set of interests Reclamation must balance in operating the Dam. Those interests include not only the endangered species below the Dam, but also tribes in the region, the seven Colorado River basin states, large municipalities that depend on water and power from Glen Canyon Dam, agricultural interests, Grand Canyon National Park, and national energy needs at a time when clean energy production is becoming increasingly important. In any event, the Court cannot conclude from the postponement of the 2010 trout removal that FWS's 2009 Supplement is invalid. The Zuni's concerns about fish killing present just as much of an obstacle to the mechanical removal of warm water predators (the Trust's preferred course of action) as it does for the removal cold water predators. The Trust cannot reasonably rely on this obstacle as a basis for opposing FWS and Reclamation's actions while at the same time arguing that any increase in warm water predators could readily be handled by mechanical removal. Stated differently, the concerns expressed by the Zuni Tribe present just as much difficulty for the Trust's requested remedy – steady flows that might result in an increase in warm water predators – as it does for the agency's actions, and therefore cannot be relied on to invalidate those actions.

*Trust III*, 2010 WL 2643537, at *19 (citations and footnote omitted).

Fourth, much of the Trust's argument in the motion to vacate focused on the fact that no Biological Opinion had been issued by FWS with respect to the 2010 cancellation of trout removal. *See* Doc. 273 at 13-15. FWS has now issued the Biological Opinion. Doc. 274. The arguments about operating the Dam in the absence of a Biological Opinion, including the parties' arguments regarding Reclamation's finding under section 7(d) of the ESA, 16 U.S.C. § 1536(d), are therefore moot. *See* Docs. 271 at 11-15, 273 at 8-10.

Fifth, the Trust asserts that mechanical trout removal has been suspended indefinitely. The Court does not agree. Reclamation has announced a suspension of only the 2010 removal trips. *See* Doc. 222. Consistent with this announcement, the 2010 Biological Opinion focuses solely on cancellation of the 2010 trips. *See* Docs. 271-1, 274-1. The future of trout removal is the subject of ongoing consultation between FWS and Reclamation. *See* Doc. 271 at 14 n.12. This ongoing consultation has not been completed, and it clearly would be improper for the Court to act on the basis of an assumption about what the agencies might or might not decide. Stated differently, the Court could not find the agencies to be acting arbitrarily and capriciously on the basis of a decision they have not yet made.

**IV.    Claim 12.**

As the Ninth Circuit has explained, Incidental Take Statements set forth a "trigger" that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision of 16 U.S.C. § 1536(o)(2), and requiring Reclamation and FWS to re-initiate consultation. Ideally, this "trigger" should be a specific number. *Ariz. Cattle I*, 273 F.3d at 1249.

Claim 12 alleges that the 2010 ITS violates the ESA and the APA. Doc. 264 at 33. The Trust contends that the 2010 ITS is insufficient for three reasons: (1) there is no support for FWS's claim that take of the young humpback chub cannot be quantified; (2) there is no support for the causal link between the consultation trigger and the take of the chub; and (3) FWS's reason for not including additional "reasonable and prudent measures" lacks support. Doc. 267 at 19-23. The Court will address each argument separately.

### 1.      **Quantifying Take.**

The 2009 ITS found that take likely would occur primarily among young chub and that this take could not be quantified because of their small size and remote location. Doc. 180-1 at 87. The Court found this to be an adequate explanation of why the take of young chub could not be quantified. *Trust III*, 2010 WL 2643537, at *22. The 2010 ITS reiterates this explanation, finding it difficult to "(1) predict the extent of the young-of-year and juvenile populations that will be exposed to take-causing conditions or (2) detect take due to the small size of the individuals likely to be affected, the large size and remoteness of the action area, and the fact that, in part, the take involves ingestion of chub by nonnative fish." Doc. 255-1 at 6.

The Trust again argues that this assertion is incorrect. Doc. 267 at 18-19. The Trust cites various studies that have identified spawning trends in the mainstem or measured young chub in particular locations at particular points in time. Doc. 267 at 18-19. The Trust does not, however, cite any study that has accurately measured the take of young and juvenile chub in the mainstem and Little Colorado River ("LCR") during a particular year. The Trust dismisses Reclamation's concerns that the area of chub habitat is too remote, noting that rafters float through the area regularly.

Critical habitat for the chub is found in a 173-mile stretch of the Colorado River in Marble and Grand Canyons, and in an eight mile stretch of the LCR above its confluence with the Colorado River. Although it is true that the river is used frequently for raft and kayak trips, this does not show that it is readily accessible for detailed annual surveys of young and juvenile humpback chub. The mainstem of the Colorado River has been described by the Ninth Circuit in these words:

> Once in the Grand Canyon, the river flows some 4,000 to 6,000 feet below the rim of the Canyon through cliffs, spires, pyramids, and successive escarpments of colored stone. Access to the bottom of the Grand Canyon can be gained only by hiking, riding mules, or floating the river. Those floating the river typically do so in motor-powered rubber rafts, oar-or paddle-powered rubber rafts, oar-powered dories, or kayaks. Floating the river through the Grand Canyon is considered one of America's great outdoor adventures and includes some of the largest white-water rapids in the United States.

1 *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1068 (9th Cir. 2010); *see also Trust II*, 623 F.Supp.2d at 1018 ("The [humpback chub] lives in the relatively inaccessible canyons of the Colorado River.").

The take of young chub at the confluence of the mainstem and the LCR is described by the 2010 ITS in these words:

> Cold water is a significant impediment for young-of-year and juvenile humpback chub. Mass movement of larval and juvenile chub out of the LCR occurs during the summer, especially during monsoon rainstorms in late summer. Young humpback chub that are washed into the mainstem are subjected to a drastic change in water temperature which can be as much as 10 °C or more. This results in thermal shock of young fish, and a reduction in swimming ability which also increases their vulnerability to predation. Cold water by itself also likely results in mortality of eggs and larval fish (Hamman 1982, Marsh 1985).

Doc. 255-1 at 5.

The confluence of the LCR and the mainstem is 76 river miles downstream from Glen Canyon Dam and approximately 60 river miles downstream from Lees Ferry, the last point where rafts may be launched on the river before entering the Grand Canyon. *See* Doc. 225-6 at 28; Doc. 136, Ex. 1 at 10. Although it is true that monitoring teams can access this remote location by floating 60 miles on rafts, the Trust does not explain how they could reliably measure the number of young chub consumed by rainbow trout, or the number of chub eggs that succumb to cold temperatures or are consumed by trout, especially with the limited equipment and time available on such a raft trip. Nor does the Trust explain how this monitoring could occur over the 20 kilometers of the mainstem (9 kilometers above and 11 kilometers below the confluence) where chub typically range. *See* Doc. 230-7 at 3. The Trust's citation to discrete measurements of young chub in discrete locations in the canyon does not show that reliable measurements of the overall annual take of young chub could be achieved at this large and remote location. The Court again finds that FWS has reached a rational conclusion, and therefore has not acted arbitrarily or capriciously, in concluding that take cannot be quantified due to "the small size of the individuals likely to be affected, the large size and remoteness of the action area, and the fact that, in part, the take involves ingestion of chub by nonnative fish." Doc. 255-1 at 6.

Congress has recognized that there are certain instances where it may not be possible to quantify take. *Or. Natural Res. Council*, 476 F.3d 1031, 1037 (2007). For example, "it may not be possible to determine the number of eggs of an endangered or threatened fish which will be sucked into a power plant when water is used as a cooling mechanism." *Id.* (quoting H.R.Rep. No. 97-567, at 27 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2827). In such instances, a surrogate measure of take may be used.

The Trust cites *Miccosukee Tribe of Indians of Florida v. United States*, 566 F.3d 1257 (11th Cir. 2009), as support for its contention that take of the young chub must be quantified. In *Miccosukee Tribe*, however, scientists conducted annual population counts of the birds in question over the course of many years, making the FWS's argument that the birds were difficult to detect unpersuasive. *Id.* at 1275. The Trust has identified no such annual surveys of young or larval chub.

In addition, whether the take of young chub in remote reaches of the Grand Canyon can be measured reliably is a matter within the expertise of FWS. When an agency is acting within the area of its expertise, at the frontiers of science, "a reviewing court must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, Inc.*, 462 U.S. 87, 103 (1983). Applying appropriate deference, the Court cannot conclude from the Trust's study citations that FWS has acted arbitrarily or capriciously in concluding that the take of young chub cannot be quantified.

### 2. Casual Link.

When take cannot be quantified and a surrogate is used for the incidental take determination, the surrogate "must be able to perform the functions of a numerical limitation," must "contain measurable guidelines to determine when incidental take would be exceeded," and must be "linked to the take of the protected species." *Or. Natural Res. Council*, 476 F.3d at 1038. The 2009 ITS adopted as a take surrogate the reconsultation trigger identified by FWS under 50 C.F.R. § 402.16(b) – a significant decline in the number of adult chub in any single year or a drop in the population of adult fish below 3,500. Doc. 180-1 at 18. The Court found the 2009 ITS insufficient because FWS did not explain

how this "adult-based consultation trigger . . . either accurately measures the take of young chub or correctly identifies the level at which the take of young chub becomes excessive." *Trust III*, 2010 WL 2643537, at *23.

On remand, FWS adopted a higher trigger: "if the number of adult chub fall[s] below the 6,000 population estimate at the time of the 2008 opinion, and if such reduction cannot be attributed to any other cause(s) besides the direct and indirect effect of implementing current operations, such reduction would indicate that the amount of anticipated incidental take was likely underestimated." Doc. 255-1 at 6. FWS explained that this adult-based consultation trigger "is appropriate because it represents the species' ability to reproduce, survive, and recruit during the life of the project which provides information on the health of the overall population." Doc. 255-1 at 7. The Trust argues that although the 2010 ITS explains how the adult-based consultation trigger is linked to the take of the species, it fails to timely identify a point at which the permitted level of take has been exceeded. The Trust argues that it will take "one to three years before lack of recruitment [into adulthood] will manifest itself." Doc. 267 at 20.

Although it is true that the adult-chub surrogate will necessarily include a delayed recognition of any excessive take of young chub, this results from the nature of the surrogate. The Trust identifies no other feasible surrogate FWS could use to measure the take of young chub. FWS credibly has concluded that the actual take of young chub and larvae cannot be quantified, as discussed above. FWS has also concluded that habitat destruction cannot be used as a surrogate because the relationship between habitat and chub population is not well understood. Doc. 225 at 35; Doc. 271 at 19 n.17.[3] FWS has selected as the surrogate an adult-population measurement, obtained regularly, that reflects the health and well being of the chub. In adopting this surrogate, FWS notes that the adult population measurement has shown a steady increase in the adult chub population over the last nine years to a current level of at least 7,650. *Id.*

---

[3] Reclamation's ongoing Nearshore Ecology Study is investigating this relationship. Doc. 180-1 at 73, 83.

The Trust essentially argues that the only ITS measure that would be legally sufficient in this case is the precise number of young and larval chub taken by operation of the 2008 Experimental Plan. The Court cannot agree that such precision is required, particularly when measuring the loss of young and larval chub in this large and remote location has not been shown to be feasible. Although numerical limits on actual take are preferred, the Ninth Circuit has made clear that estimates can suffice if reasonably linked to the take: "We have never held that a numerical limit is required. Indeed, we have upheld Incidental Take Statements that used a combination of numbers and estimates." *Ariz. Cattle I*, 273 F.3d at 1249. "[W]hile Congress indicated its preference for a numerical value, it anticipated situations in which impact could not be contemplated in terms of a precise number." *Id.*

FWS has concluded that the take of young and larval chub that will be caused by Dam operations under the 2008 Experimental Plan will not result in a decrease of the adult chub population. Doc. 255-1. FWS has also reasonably concluded that a drop in the adult population below 6,000 would signify an excessive take of young chub sufficient to warrant the reopening of consultations. The Court concludes that this trigger constitutes a reasonable measure of the effects of Dam operations on the chub, particularly given the remote location of the chub's habitat and the fact that actual take of young and larval chub cannot be quantified. The trigger is "able to perform the functions of a numerical limitation," contains "measurable guidelines to determine when incidental take [will] be exceeded," and is "linked to the take of the protected species." *Or. Natural Res. Council*, 476 F.3d at 1038. The Court accordingly concludes that it is not arbitrary and capricious.[4]

---

[4] The Trust also argues that a two- or three-year delay in detecting any adverse take of young chub will mean that the take cannot be acted upon within the life of the 2008 Experimental Plan, which runs only through 2012. Doc. 267 at 20. The Court does not agree that this constitutes a fatal flaw in the 2010 ITS. First, any excessive take of the chub during the first years of the 2008 Experimental Plan (2008 and 2009) will be shown in the adult chub population before the expiration of the plan. Second, this is not a case where the federal action will end before the take can be measured, resulting in a meaningless reconsultation trigger. *See, e.g.*, *Or. Natural Res. Council*, 476 F.3d at 1039. Reclamation's operation of the Dam will continue well beyond 2012.

The Trust also argues that the consultation trigger is imprecise because it includes a confounding qualification – that the drop in chub population below 6,000 must be due to "the indirect and direct effects of implementing current operations," and not to other causes. Doc. 255-1 at 6. Elsewhere, FWS is more precise: "if monitoring detects a decrease in the adult chub population below the 6,000 estimate that is not attributable to other factors (such as parasites or diseases), that decrease is reasonably indicative of higher than expected levels of juvenile mortality caused by the proposed action." *Id.* at 7. The Court reads this language to mean that *any* drop in the adult chub population below 6,000, except one clearly resulting from an identifiable non-MLFF cause such as a specific parasite or disease, will trigger reconsultation under the 2010 ITS. This interpretation is reinforced by FWS's statement that drops due to "indirect and direct effects" of MLFF will trigger reconsultation. *Id.* at 6.

So construed, the Court does not find the 2010 ITS unworkable. The trigger is reasonably precise, and is not "within the unfettered discretion" of FWS, "leaving no method by which the applicant or action agency can gauge their performance." *Ariz. Cattle I*, 273 F.3d at 1250.

### 3. Measures to Minimize Take.

Section 7 of the ESA requires that FWS "specify those reasonable and prudent measures ["RPMs"] that [FWS] considers necessary or appropriate to minimize" incidental take. 16 U.S.C. § 1536(b)(4)(ii). The 2009 ITS set forth only one RPM to be used by Reclamation to minimize take – monitoring of the chub's condition and reporting to FWS. In *Trust III*, the Court found that although the 2009 ITS did "set forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by [Reclamation] to implement the [RPMs]," it did not explain why monitoring was "the only RPM necessary to minimize the take of young chub through MLFF." 16 U.S.C. § 1536(b)(4)(iv); *Trust III*, 2010 WL 2643537, at *24.

The 2010 ITS explains why FWS included only monitoring as an RPM. It notes that the 2008 Experimental Plan includes a number of chub conservation measures and explains that "FWS was not aware of any additional measures that would minimize the impact of take

- 13 -

of the chub and not alter the basic design, location, scope, duration, or timing of the action in more than a minor way as required by the regulations at 50 CFR 402.14(i)(2)." Doc. 255-1 at 9. FWS further states that "the conservation measures under the [2008 Experimental Plan] were considered by the FWS to be sufficient to provide for the continued upward trend in humpback chub numbers, and in this way to serve to adequately minimize the impacts of take of young chub on the species." *Id.*

The chub conservation measures included in the 2008 Experimental Plan have previously been described by the Court:

> (1) Reclamation and FWS will reinitiate consultation concerning the chub if the population drops in any single year below 3,500 adult chub; (2) Reclamation, through AMP, will develop a comprehensive plan for the management and conservation of chub in the Grand Canyon; (3) Reclamation will work with the National Park Service to establish spawning populations of the chub in tributaries of the Colorado River such as Havasu, Shinumo, and Bright Angel Creeks; (4) Reclamation, through AMP, will continue to control non-native fish that prey on the chub; (5) Reclamation will takes steps to minimize variations in flow between months – variations that can adversely affect backwater habitat; (6) Reclamation will undertake a nearshore ecology study to examine the effects of flow variations on nearshore habitat; (7) Reclamation and FWS will create a humpback chub refuge in a fish hatchery to protect against catastrophic loss of the chub in the Colorado River; and (8) Reclamation will continue to help other stakeholders in the Little Colorado River watershed develop a plan that protects watershed levels for the chub.

*Trust II*, 623 F.Supp.2d at 1023-24.

The Trust argues that FWS's reliance on these conservation measures is unreasonable because the only measure that could possibly minimize take is the mechanical removal of trout, and that measure has been cancelled indefinitely. Doc. 273 at 19. As noted above, mechanical removal has been cancelled only for the year 2010, not indefinitely, and FWS has issued the 2010 Biological Opinion finding that the one-year cancellation will not jeopardize or improperly take the chub or adversely modify its critical habitat. Doc. 274. Moreover, the Court does not agree that mechanical removal of trout is the only conservation measure that could minimize take of the chub. The 2008 Experimental Plan includes the establishment of new spawning populations of humpback chub – a step already taken successfully in Shinumo Creek and above Chute Falls on the LCR. *Trust III,* 2010 WL

2643537, at *15. The plan also includes steps to minimize variations in flow between months that can adversely affect backwater habitat; a Nearshore Ecology Study to examine the effects of flow variations on nearshore chub habitat; and creation of a humpback chub refuge in a fish hatchery to protect against catastrophic loss of the chub – a step completed when the refuge was created at the Dexter National Fish Hatchery and Technology Center. *Id.* at *9, *21. In addition, the 2008 Experimental Plan includes the conservation measures of a high-water release in March of 2008 to build beach and backwater habitat, and steady flows in September and October of each year from 2008 to 2012. *Id.* at *2. What is more, the Ninth Circuit has recognized monitoring – the one RPM added by the 2010 ITS – as a "concrete measure" to minimize take. *Or. Natural Res. Council*, 476 F.3d at 1039 n.7.

The Court thus cannot accept the Trust's argument that the 2010 ITS is insufficient because the only concrete chub conservation measure has been cancelled indefinitely. That step has not been cancelled indefinitely, and other concrete conservation measures are specified in the 2008 Experimental Plan and are being implemented by Reclamation. FWS's reliance on these existing conservation measures, as a reason for not specifying others as RPMs, is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. FWS has "articulated a rational connection between the facts found and choice made." *Ariz. Cattle I*, 273 F.3d at 1236.

### 4. Conclusion.

The 2010 ITS sufficiently explains why the take of young chub cannot be quantified, provides a causal link between the adult-based surrogate and the take of young chub, and provides a rational explanation as to why no additional RPMs are necessary. The Court accordingly will enter summary judgment in favor of Defendants on Claim 12.

## V.     Claim 13.

Claim 13 alleges that FWS violated NEPA when it issued the 2010 ITS without first preparing an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS"). Doc. 264 at 35. NEPA requires that federal agencies prepare these documents to evaluate the potential environmental impact of any proposed "major Federal actions significantly

affecting the quality of the human environment." 43 U.S.C. § 4332©. The Trust contends that the 2010 ITS is a major federal action. Doc. 267 at 23. The Court previously addressed a similar contention in Claim 10, which was directed at the 2009 ITS:

> FWS did not prepare an EIS before issuing the 2009 ITS. The Trust contends that this violated NEPA. Significantly, the Trust brings Claim 10 against FWS, not Reclamation. It is not the operation of the Dam, but FWS's issuance of the 2009 ITS, that the Trust claims to be a "major federal action." FWS argues that this claim fails because Reclamation, not FWS, will be taking action under the 2009 ITS. The Court agrees.
>
> Courts repeatedly have declined to require consulting agencies to comply with NEPA when a separate federal agency takes the action. *See Consolidated Salmonid Cases*, 688 F.Supp.2d 1013, 1025 (E.D.Cal.2010) ("[I]t is the operation of the projects by Reclamation, not the issuance of the BiOp that triggers NEPA."); *San Luis & Delta-Mendota Water Auth. v. Salazar (Delta Smelt)*, 686 F.Supp.2d 1026, 1044 (E.D.Cal.2009) (Reclamation rather than FWS is the "appropriate lead agency under NEPA."); *Miccosukee Tribe of Indians of Fla. v. U.S.*, 430 F.Supp.2d 1328, 1335 (S.D.Fla.2006) ("[A]ny physical impacts on the environment result from actions taken by the action agency (the Corps) in response to the ITS," and, for this reason, "the Corps" and not FWS "was required to . . . undertake its own NEPA review."); *City of Santa Clarita v. U.S. Dep't of Interior,* No. CV02-00697 DT (FMOx), 2006 WL 4743970, * 19 (C.D.Cal. Jan.30, 2006) (FWS "is not the 'action agency' with regulatory jurisdiction to approve this project," but rather "BLM is the federal agency that approved the Project and that approval is a 'major federal action' for NEPA purposes.").
>
> The Trust cites *Ramsey v. Kantor*, 96 F.3d 434, 437 (9th Cir.1996), in support of its argument. In *Ramsey*, the [National Marine Fisheries Service ("NMFS")] issued an ITS that allowed taking of endangered salmon in the Columbia River. The ITS did not concern the actions of another federal agency, but was issued so the states of Oregon and Washington could promulgate regulations governing fishing in the Columbia River. Because Oregon and Washington were not federal agencies required to comply with NEPA, and yet could not promulgate fishing regulations without the ITS, the Ninth Circuit found that the ITS was "the functional equivalent to a permit" and that the NMFS action of issuing the permit constituted a major federal action triggering NEPA compliance. *Ramsey*'s holding has been construed narrowly. *See, e.g., Sw. Ctr. for Biological Diversity v. Klasse*, No. CIV S-97-1969 GEB JF, 1999 WL 34689321, * 11 (E.D.Cal. Apr.1, 1999) (*Ramsey*'s holding "evinces that it did not intend to require the FWS to file NEPA documents every time it issues an incidental take statement to a federal agency"). As courts have noted, there was "no action agency in [*Ramsey*] that was responsible for NEPA compliance." *Miccosukee*, 430 F.Supp.2d at 1335. NMFS was the only federal agency involved. When another federal agency will take the action authorized by the ITS, courts interpreting *Ramsey* have held that the action agency, not FWS or NMFS, must comply with NEPA. *See Consolidated Salmonid Cases*, 688 F.Supp.2d at 1022; *Delta Smelt*, 686 F.Supp.2d at 1044; *Miccosukee*, 430 F.Supp.2d at 1335; *City of Santa Clarita*, 2006 WL 4743970 at * 19. . . .

> The Court concludes that FWS was not required to conduct a NEPA analysis when it issued the 2009 ITS. FWS is entitled to summary judgment on Claim 10.

*Trust III*, 2010 WL 2643537, at *25-26. For the same reasons, FWS is entitled to summary judgment on Claim 13.

The Trust argues that the EA performed by Reclamation for the 2008 Experimental Plan did not address the action authorized by the 2010 ITS and therefore cannot satisfy NEPA's requirement. The Court is not convinced this is correct. The EA did address a consultation that would apply if the chub population significantly declined in any single year or reached a population estimate of 3,500. Doc. 136-1 at 19. The 2010 ITS sets a higher trigger of 6,000. Doc. 255-1. But even if the Trust is correct in arguing that Reclamation's EA did not address the 2010 ITS, Claim 13 is not brought against Reclamation, the agency that will implement the action authorized by the 2010 ITS. As the cases cited above hold, the action agency, not FWS, bears the burden of NEPA compliance.

## VI.   Claim 3.

Claim 3 alleges that Dam operations under the MLFF regime constitute an illegal take of the chub in violation of the ESA. Doc. 264 at 24. Given that the 2010 ITS is valid under the ESA, NEPA, and the APA, Reclamation is not unlawfully taking chub as prohibited by the ESA. *See* 16 U.S.C. §§ 1536(o)(2), 1538(a)(1)(B), 1539(a)(1)(B).

The Trust argues that even if the 2010 ITS is deemed valid, it does not cover take that will occur as a result of the cancelled 2010 mechanical trout removal. Doc. 267 at 14-16. As noted above, however, FWS has issued a 2010 Biological Opinion and ITS that specifically address the cancellation. Doc. 274-1. The Trust does not challenge the validity of these documents. Given this separate ITS, Reclamation is not unlawfully taking the chub by virtue of the 2010 cancellation of mechanical trout removal. *See* 16 U.S.C. §§ 1536(o)(2), 1538(a)(1)(B), 1539(a)(1)(B).

The Trust also argues that larval chub are washed from the LCR into the mainstem from April through June, the larval chub succumb in the cold water of the mainstem, the 2010 ITS fails to cover this take of larval chub, and Reclamation therefore is violating the

1  ESA by this form of take. Doc. 267 at 16. But the 2010 ITS does address this form of take.
2  *See* Doc. 255-1 at 5 ("Mass movement of larval and juvenile humpback chub out of the LCR
3  occurs during the summer, especially during monsoon storms in late summer. . . . Cold water
4  by itself . . . likely results in mortality of eggs and larval fish."). The 2010 ITS concludes,
5  nonetheless, that "the number of adults is a suitable surrogate for measuring the incidental
6  take of young chub." *Id*. Because this form of take is specifically addressed in the ITS and
7  covered by the take surrogate, it does not result in a violation of the ESA. *See* 16 U.S.C.
8  §§ 1536(o)(2), 1538(a)(1)(B), 1539(a)(1)(B).

**IT IS ORDERED.**

1. The Trust's motion to vacate (Doc. 265) is **denied**.
2. The Trust's motion for summary judgment (Doc. 266) is **denied**.
3. Summary judgment is **granted** to Defendants on Claims 3, 12, and 13.
4. This ruling resolves all outstanding claims in this case. The Court's decisions in *Trust I, II, III* and this order are deemed final judgments for purposes of appeal. The Clerk is directed to terminate this action.

DATED this 29th day of March, 2011.

*David G. Campbell*
David G. Campbell
United States District Judge